319 So.2d 855 (1975)
Bobbye S. WILSON
v.
F. C. DOYAL, Jr., etc., et al.
No. 10405.
Court of Appeal of Louisiana, First Circuit.
September 2, 1975.
Kenneth J. Fogg, Denham Springs, for appellant.
Marion Weimer, Baton Rouge, for appellees.
Before SARTAIN, COVINGTON and BARNETTE, JJ.
BARNETTE, Judge.
This is an appeal by a resigned employee of the Baker Bank and Trust Company for unemployment compensation benefits. Specifically she has appealed from a judgment of the District Court which upheld the decision of the Board of Review of the Department of Employment Security which had found the claimant disqualified for unemployment compensation benefits for the reason that she had resigned her position of employment voluntarily, and without cause connected with her employment.
Mrs. Bobbye S. Wilson was employed as a bank teller by Baker Bank and Trust Company for a period of four and a half years. She resigned her position on June 30, 1974 after giving the Bank a two weeks notice. Her employer notified the Department of Employment Security of the termination of her employment by resignation. After a representative of the Department questioned the claimant for reasons it was determined that she had resigned for good cause connected with her employment. She was ruled eligible for unemployment compensation benefits.
Her former employer, the Bank, appealed this ruling and a hearing was had before the Appeals Referee, Kenneth Driggers, on July 19, 1974. The only appearance for the hearing was a representative of the Bank, Floyd White, Vice President. The claimant, Mrs. Wilson, was not present, nor was she represented. She alleged that she has never received a notice of that hearing.
Following that hearing, the Appeals Referee reversed the determination of eligibility and ruled the claimant disqualified as of *856 May 31, 1974. In the meantime she had received seven weekly unemployment compensation checks of $70 each.
Upon receipt of notice of her disqualification, the claimant immediately filed an appeal with the Board of Review. The Board, acting upon the record of evidence taken by Mr. Driggers ordered his decision of disqualification to be upheld.
The claimant then sought judicial review of the action of the Board of Review. The Court, on December 13, 1974, ordered the case remanded to the Board of Review for additional evidence. Accordingly, a further hearing was had by the Board of Review on January 21, 1975. That hearing was attended by the claimant and her attorney and two witnesses on her behalf. There is no explanation why but the employer, the Bank, was not represented and the only additional evidence submitted was the testimony of the claimant and her two witnesses.
The Board again ruled against the claimant and reaffirmed its previous ruling upholding the decision of disqualification made by the Appeals Referee, Mr. Driggers. Due return was made to the Court, which rendered judgment upholding the decision of the Board of Review. It is that judgment which the claimant now appeals to this Court.
The facts brought out at the two hearings are that Mrs. Wilson resigned upon giving two weeks notice. She did not state in her letter specific reasons for resigning. Mr. Floyd White, Vice President of the Bank, who testified at the first hearing said she gave no definite reason, but that he knew that she had expressed reasons to other persons.
Mrs. Wilson testified at the second hearing
"Well, I just didn't think it was fair that I wasn't paid for my sick leave when other people were and I wasn't given any explanation as to why I had to do my extra work later. I informed Mr. White of this and he simply told me that I could stay on the job if I wanted to under the circumstances."
In the information given by her in connection with her application for benefits she said "I had to quit under the circumstances." We think there is no doubt that Mr. White knew of the "circumstances" of which she complained.
Her grievances were: (1) That changes were made in her work assignments which were discriminatory in that other employees of the same rank were not subjected to the same changes. (2) That she was denied sick leave benefits when other employees were allowed sick leave. This, she alleged was arbitrary and discriminatory. (3) That a policy change was put into effect which required her to give up her Thursday afternoon early release to take her child to a special education class, which allowed other tellers to change from Wednesday afternoon early release to Thursday afternoon to accommodate the appointment schedule of their beauty operator. This, she alleged was arbitrary and discriminatory.
On the second hearing Mrs. Wilson gave testimony in support of the foregoing grievances and was substantially corroborated by two witnesses, namely, Gene Ransome, Cashier of the Bank, and Jessie Bourgoyne, Head Teller.
Mr. White testified that Mrs. Wilson's working hours and work assignments had not been changed to his knowledge in eight or nine months. He then added:
"I know of no change in her job duties because she has had that assignment for about the last two years as far as I know."
All of the tellers were required to do certain so called "extra" jobs, for example, to credit and debit special accounts such as automatic savings and Christmas Club accounts and to receive certain collection payments for the Town of Baker. These duties were referred to as "extra" regular *857 duties. The tellers were permitted to discharge these duties during regular banking hours so long as it did not interfere with their duties as tellers in waiting on the Bank's customers.
Mrs. Wilson testified that on orders of Mr. White, her supervisor told her she was no longer to do her Christmas Club and Savings Accounts credit and debit work during regular banking hours, but to do so only after balancing her money after banking hours. She testified that the same requirement was not made of the other tellers. This made her work-day longer than that of the other tellers which she thought was arbitrary and discriminatory. Mr. Bourgoyne, the Head Teller, and her supervisor, verified this testimony and admitted that he gave her those orders under order from Mr. White. He acknowledged that the other tellers were not restricted from doing their "extra" duties during regular banking hours. He gave as a reason for Mr. White's orders an alleged complaint that Mrs. Wilson had neglected waiting on customers to do her debit and credit work. This unverified complaint is the only implication we find in the record that Mrs. Wilson did not perform her duties properly. Mr. Bourgoyne testified as follows:
A. "Well, he said that it was brought to his attentionwell, he didn't say that he just told me that she was not to do her Christmas Club debits in the afternoon because he was made aware, that's more or less what he said, he was made aware of the fact that she was not waiting on customers while she was doing her debits. You want me to go into detail what that is?
Q. "Unless you would like to.
A. "No, that's okay. So he related to me to the fact that I was to tell her, you know, that she was to do it after 2 o'clock after the rest of the bank was closed and that she was not to argue or say anything about itjust do it.
Q. "I see. Were the other tellers told the same thing?
A. "No.
Q. "The other tellers were allowed to continue doing their extra chores during the day.
A. "Right."
This discriminatory treatment of Mrs. Wilson in regard to the required hours for doing her "extra" work was corroborated further by the testimony of Gene Ransome, Cashier. He testified that he was aware of Mr. White's order that Mrs. Wilson not be permitted to do her "extra" duties during banking hours and that she was required to do them after regular banking hours. He testified further as follows:
Q. "Now, were all tellers told this or were some allowed to continue doing their extra duties.
A. "As far as I know some tellers were still allowed to do their extra duties during the working hours.
Q. "What about Mrs. Wilson? Was she allowed to do hers?
A. "No, she wasn't.
Q. "She was required to do her extra duties at the closeafter the bank closed.
A. "Right."
Both Mr. Ransome and Mr. Bourgoyne testified that there was no definite policy regarding sick leave benefits. Mr. Ransome said that when he was in charge of operations they followed approximately the same policy as American Bank, which was to allow sick leave with pay of one day per month or twelve a year.
Mr. Bourgoyne testified that when the tellers missed days from work on account *858 of sickness or other personal reasons, other tellers would do their work and said:
"[When] they came back they might offer to work the day back but it was never ruled that they had to make the day up and several times when Bobbye [Mrs. Wilson] was either out or something, you know, when she got back I was called into his [we assume Mr. White's] office and told that she was to make the day up. . . . I don't know . . . what started it but I was told for her sake, you know, for her to make it up."
Mrs. Wilson had an accident in April resulting in a broken hand which disabled her for several days. She missed a week from work and then took an early vacation of two weeks, during which she hoped her recovery would be complete. She was docked one week's pay. When Mr. White was asked about this he is alleged to have replied that he paid sick leave according to what he felt an employee needed. Mr. White's statement was:
"As far as her statement saying that we pay according to the needs of the individualthat is not the way thatcertainly not the way I intended for it to sound. We pay according to the disposition of the absence."
He further acknowledged that she was not paid for one week she was out on account of the accident.
It was the Bank's policy to allow each of the tellers to leave early one afternoon a week after balancing their accounts after the Bank's closing hour at 2:00 P.M. They rotated duties at the drive-in windows which required longer hours. For some time Mrs. Wilson was given early release on Thursday afternoons to take her child to a special education class. This was changed in order to accommodate the convenience of other tellers in meeting beauty shop appointments. Mr. Bourgoyne explained this change in routine as follows:
"Well, sheit was allowed untilwell, the other tellers, there was two other ones they was going for hair appointments on Wednesday and so I think Bobbye or one of the other tellers was working Wednesday while they was going there and one of those two was working Thursday while she was taking her son to that class and wherever they got their hair fixedthe lady went out of business or changed schedules or something so the two tellers wanted to get their hair fixed on Thursday too and went to Mr. White with it and so he ruled down that they would each have to take a separate turn on Thursday because it was just as important for them to get their hair fixed as it was for her to take her kid to a special school."
There is no testimony or other evidence in the record to contradict the testimony of Mrs. Wilson and her two witnesses, Mr. Ransome and Mr. Bourgoyne, relating to the discriminatory conditions of her employment. The testimony of Mr. White that there was no change "to [his] knowledge" in Mrs. Wilson's working hours and conditions and that he knew "of no change in her job duties because she had that assignment for about the last two years as far as I know" does not contradict the testimony of his employees that she was required to perform those duties under conditions that did not apply to the other tellers. He did not give any testimony categorically touching upon her complaint of the discriminatory treatment. Furthermore, we have already noted his acknowledgment that she was denied one week's sick-leave pay and there is no testimony by him to contradict his employees, Ransome and Bourgoyne, that other employees were not denied sick leave under similar situations. We therefore find no evidence in the record to support Mr. White's contention that Mrs. Wilson resigned her position without cause. The evidence clearly establishes the fact that she was subjected to working conditions which were not imposed *859 upon other employees of equal rank and this constituted discriminatory and unfair treatment. We hold that Mrs. Wilson had good cause to resign her position and is eligible for payment of unemployment benefits.
We are fully aware of the provisions of La.R.S. 23:1634 that:
"In any proceeding under this Section the findings of the board of review as to the facts, if supported by sufficient evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the court shall be confined to questions of law." (Emphasis added)
The jurisprudence on this and similar provisions relating to other administrative boards is well settled that where there is no substantial evidence in fact to support the decision of the board, the court may, if the other evidence so warrants, set aside the ruling of the board. Kansas City Southern Railway Company v. Louisiana Public Service Commission, 254 La. 160, 223 So.2d 132 (1969); Rankin v. Doyal, 223 So.2d 214 (La.App. 2d Cir. 1969); Gardere v. Brown, 170 So.2d 758 (La.App. 1st Cir. 1964); Broussard v. Administrator, Division of Employment Security, 121 So. 2d 268 (La.App. 1st Cir. 1960); Raborn v. Heard, 87 So.2d 146 (La.App. 1st Cir. 1956).
It is our opinion that there is no evidence in the case to support the ruling of the Board of Review, especially in view of the clear showing made by the claimant of prejudicial and discriminatory conditions imposed upon her relating to her employment. We find that she had good cause to resign rather than to continue to work under those conditions.
The judgment appealed is reversed and judgment is rendered in favor of the appellant, Bobbye S. Wilson, and against the defendant, Board of Review for the Department of Employment Security, setting aside and annulling its order sustaining the decision of the Appeals Referee which disqualified the claimant and holding her ineligible for unemployment compensation benefits. It is further ordered and decreed that appellant, claimant, Bobbye S. Wilson, be reinstated for said benefits according to law.
The appellee is cast for such costs of this proceeding as are in accordance with law.
Reversed and judgment rendered.